# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FREEMAN JORDAN,

            Plaintiff,

        v.

KRISTI NOEM, SECRETARY,
Department of Homeland Security,[1]

           Defendant.

No. 22-cv-2453

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiff Freeman Jordan alleges that he faced race-based discrimination, retaliation, and a hostile work environment while employed as an Assistant Supervisory Agent in Charge ("ASAC") of the Chicago office of the Federal Air Marshals Service ("FAMS"). Plaintiff contends that his supervisors interfered with his opportunities for promotion and awards because of his race. Defendant has moved for summary judgment.

For the reasons that follow, the Court holds that Plaintiff's claims are either not exhausted, not legally cognizable, or lack sufficient evidentiary support. Accordingly, Defendant is entitled to summary judgment on all counts.

---

[1] The caption has been changed to reflect that Kristi Noem was sworn in as Secretary of Homeland Security on January 25, 2025. *See* Fed. R. Civ. P. 25(d) (successor to office "is automatically substituted as a party.").

## I.  BACKGROUND

As an Assistant Supervisory Agent in Charge ("ASAC") in the Federal Air Marshals Service ("FAMS") before his retirement in 2022, Plaintiff's job was to handle the day-to-day issues that arose in the field office, from deployment of flying federal air marshals to their discipline, training, or medical issues. (Dkt. 37 ¶¶ 1–3.) Plaintiff says FAMS discriminated against him because of his race (African American), subjected him to a hostile work environment, and retaliated against him when he was not selected for two promotions and was the subject of a harassment investigation that went on for too long. (*See generally* Dkt. 36.) Plaintiff was supervised by Ronald Phifer, Supervisory Agent in Charge of the Chicago Field Office, who was supervised by Sterling Keys, Regional Director. (Dkt. 41 ¶ 1.) At the top of the supervision hierarchy was Michael Ondocin, the former Director of FAMS. (*Id.*) There were two ASACs in the Chicago field office, Plaintiff and Michael Buchanan. (*Id.* ¶ 2.)

In 2018, Plaintiff filed an EEO complaint against David Kohl, who was the former Director of FAMS. (*Id.* ¶¶ 3, 5.) In 2019, Plaintiff filed another EEO complaint.[2] (*Id.* ¶ 5.) Both complaints alleged race discrimination and retaliation. (Dkt. 37 ¶ 24.) In October 2020, Plaintiff filed yet another EEO complaint, alleging race discrimination, retaliation, and a hostile work environment. (*Id.*) That EEO complaint serves as the basis for the present case, and Plaintiff pursued the 2018 and 2019 EEO complaints in a separate action in federal court. (*Id.*) Defendant was

---

[2] The statements of facts do not specify against whom the 2019 EEO complaint was filed.

granted summary judgment in that matter. *Jordan v. Mayorkas*, No. 20-cv-04450 (N.D. Ill. Nov. 4, 2024) (Dkt. 69).

The 2018 and 2019 EEO actions are relevant because Plaintiff now alleges that the filing of those actions, in addition to other legal efforts placing blame on his supervisors, prompted his supervisors to mistreat him. (*See* Dkt. 36 at 2.) For example, Plaintiff says that he was an excellent performer in FAMS and never received discipline in his previous eighteen years of service, but that after filing multiple complaints against his supervisors, he received five harassment complaints in his last five years of employment. (Dkt. 41 ¶ 3.) Plaintiff believes those complaints were unfounded but were escalated and elongated by his supervisors as a form of retaliation. (*See*, *e.g.*, Dkt. 36 at 2, 14.)

Plaintiff focuses on one of those harassment complaints. In August 2019, Josh Boehrns ("Josh B.") filed a harassment complaint against Plaintiff. (Dkt. 37 ¶ 6.) The parties dispute some details but agree that Plaintiff thought Josh B. was being dishonest and that Plaintiff recommended Josh B. be removed from international missions for six months. (*Id.* ¶¶ 6–7.) Ultimately, Phifer and Keys (Plaintiff's supervisors) decided to remove Josh B. for only ninety days. (Dkt. 41 ¶ 7.) Plaintiff and another individual relayed the decision to Josh B. (Dkt. 37 ¶ 8.) In response, Josh B. filed a harassment complaint against Plaintiff. (*Id.*) According to Defendant, Josh B. said Plaintiff used profanity, pounded the table, and threatened him during the meeting (Plaintiff disputes this). (*Id.*)

Plaintiff believes the complaint was meritless and could have been resolved at the Chicago field office level. (*Id.* ¶¶ 9–10.) Instead, the complaint was escalated, which led to an incident tracking report ("ITR"), and then proceeded to the fact-finding stage. (*Id.* ¶ 9.) The fact-finding was conducted by David Park, a Detroit ASAC, and Robert Duerr, a Los Angeles ASAC. (*Id.* ¶ 11.) Plaintiff became aware of the ITR when Phifer informed Plaintiff that he would be interviewed. (Dkt. 41 ¶ 14.) The ITR remained open against Plaintiff for almost a year. (*Id.* ¶ 37.) As a result of the open investigation, performance awards Plaintiff had earned were delayed for over a year, and Plaintiff did not receive "on-the-spot" awards. (*Id.* ¶ 35.) In addition, Plaintiff complains that the ITR was left open against him for too long, which interfered with his general reputation and the selection process for two promotion opportunities. (Dkt. 36 at 12–14.)

Those promotion opportunities included the following: in 2020, Plaintiff applied for both a Supervisory Air Marshal position in Atlanta ("Alanta SAC") and a Deputy Executive Assistant Administrator position at headquarters ("DEAA"). (Dkt. 36 at 1; Dkt. 37 ¶ 13.) The selection panel for the Atlanta SAC was comprised of Sterling Keys, Sonya Proctor, and William Auperlee. (Dkt. 37 ¶ 13.) Keys, who was two levels above Plaintiff in the chain of command (*id.*), again was both a subject of Plaintiff's previous EEO complaints and was involved in the Josh. B. suspension. Plaintiff alleges that his non-selection for the Atlanta SAC position was the result of bias and retaliation by Keys. (*See* Dkt. 36 at 8.)

4

Keys, who chaired the panel, says he consulted legal counsel regarding any potential conflicts of interest, but was told to remain part of the panel. (Dkt. 37 ¶ 14.) Plaintiff nonetheless blames Keys and accuses him of scoring Plaintiff "amongst the lowest of potential candidates at 15." (Dkt. 36 at 8–9.) Plaintiff also complains that Keys called him to inform him that Plaintiff did not receive the Atlanta SAC role. (Dkt. 36 at 9.) According to Plaintiff, Keys called before Christmas and said, "I don't mean to be the Scrooge that's going to ruin your Christmas, but I just wanted to let you know that you were not selected." (Dkt. 37 ¶ 18.)

In 2020, Plaintiff also applied for the DEAA position but was not selected for an interview. (Dkt. 37 ¶ 19.) Plaintiff believes that FAMS leadership prevented fair and equitable consideration of his application. (Dkt. 41 ¶ 28.) Neither Keys nor Phifer (Plaintiff's supervisors) were involved, and Keys himself was also an unsuccessful applicant for the role. (Dkt. 37 ¶ 20.) Plaintiff alleges that Michael Ondocin, FAMS Director, made the decision that Plaintiff would not be interviewed. (Dkt. 36 at 10.) Defendant disputes Ondocin's involvement. (Dkt 41 ¶¶ 28–29.)

Plaintiff also alleges that he was subjected to a hostile work environment based on his race and his earlier EEO activity. (Dkt 37 ¶ 21.) Plaintiff points to his two non-selections, the way he was informed of his non-selection for the Atlanta SAC position, the filing of Josh B.'s harassment complaint, the length of the investigation, delayed awards, and that his supervisors did not entirely support some of his recommendations to demonstrate that his work environment was, in fact, hostile. (*Id.* ¶¶ 21–22.)

In October 2020, Plaintiff filed an EEO complaint alleging discrimination, retaliation, and hostile work environment. (*Id.* ¶ 24.) At the conclusion of the administrative process, Plaintiff filed this case. (Dkt. 2 ¶¶ 6–10.) Count I alleges discrimination on the basis of race. (*Id.* ¶¶ 50–57.) Count II alleges a hostile work environment under Title VII. (*Id.* ¶¶ 58–60.) Counts III and IV allege retaliation under Title VII. (*Id.* ¶¶ 61–72.)

## II.  STANDARD OF REVIEW

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the "put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, are viewed in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III. DISCUSSION

### A. Race-Based Discrimination (Count I)

In Count I, Plaintiff brings a claim for "Discrimination in Violation of Title VII." (Dkt. 2 at 7.) As Defendant points out, Plaintiff cites 42 U.S.C. § 1981 as the cause of action, but that cannot be correct because "[o]nly actions taken under color of state law are actionable under § 1981," and accordingly, a Section 1981 claim cannot be brought against a federal actor. *Bell v. DeJoy*, No. 24-1478, 2024 WL 4948846, at \*4 (7th Cir. Dec. 3, 2024). Title VII is instead the "exclusive remedy for employees of the federal government." *Id.* (citing *Mlynczak v. Bodman*, 442 F.3d 1050, 1057 (7th Cir. 2006)). Defendant asks that the Court dismiss Count I on this basis alone (Dkt. 30 at 6). Although Plaintiff's citation to Section 1981 was in error, Plaintiff points out that the title of the claim and the complaint as a whole reference Title VII. (Dkt. 36 at 5.) Based on the foregoing, this decision overlooks that error and will analyze Count I under Title VII, 42 U.S.C. § 2000e, *et seq.*

A federal employee who believes he has been discriminated against "must exhaust an intra-agency process before suing under Title VII." *DeJoy*, 2024 WL 4948846, at \*2 (citing 42 U.S.C. § 2000e-5.). First, an employee must attempt to resolve the matter informally through his agency's EEO Office within 45 days of the alleged discriminatory matter. *Id.* (citing 29 C.F.R. § 1614.105(a)). If no resolution is reached, the employee has 15 days to file a formal complaint "with the agency that allegedly discriminated against [him]." *Id.* (quoting 29 C.F.R. §§ 1614.105(d), 1614.106(a)–(b)). The agency's EEO office "then determines whether the complaint should be dismissed on procedural grounds." *Id.* If not, the EEO office investigates

and informs the employee that he can "request an immediate final decision by the employing agency's EEO Office." *Id.* After the final action, a right-to-sue notice is given. *Id.*

On summary judgment for a Title VII race-based discrimination claim, a court must ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Although not required, one method a plaintiff may choose to pursue his claim is the "*McDonnell Douglas* 'burden-shifting framework.'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)); *see also generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework asks a plaintiff to show a prima facie case by demonstrating that he: (1) is a member of a protected class; (2) met the defendant's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees not members of the protected class. *McDaniel*, 940 F.3d at 368.

If a plaintiff satisfies each element of their prima facie case, the burden shifts to the defendant "'to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719–20 (7th Cir. 2018)); *see also Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023). Even if a plaintiff fails to succeed under

8

*McDonnell Douglas*, the Court must assess the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . ." *Ortiz*, 834 F.3d at 765. Under any formulation of the test at summary judgment, Plaintiff does not meet his burden.

### 1.    *Summary of Alleged Discrimination*

Plaintiff's submissions are at times unclear, with Count I providing a hodgepodge of ills Plaintiff faced. For example, Plaintiff contends he was treated differently based on race; Plaintiff faced reckless interference with his opportunity for promotion and his role was minimized, among other generalized claims. (Dkt. 2 ¶¶ 50–57.) Plaintiff's primary grievance appears to be his non-selection for the Atlanta SAC and DEAA positions. (*E.g.*, *id.* ¶¶ 19, 46.) But Plaintiff also complains about the Josh B. investigation, which, in Plaintiff's view, took too long, obstructed his work and promotional opportunities, and interfered with the timely receipt of awards and bonuses earned by Plaintiff. (*Id.* ¶¶ 29–32, 41, 48.)

Although Plaintiff complains about a number of actions, the precise nature of his discrimination claim is murky—and this record is even more confusing on summary judgment. In his opposition to the motion for summary judgment, Plaintiff "withdraws claims for consideration in this matter relevant to discrimination based upon race as to the adverse actions of non-selection of the 2020 Atlanta Supervisory Federal Air Marshal in Charge ('SAC') and Deputy Executive Assistant Administrator ('Deputy Director' or 'DEAA')." (Dkt. 36 at 1.) Plaintiff does not specify *which* claims he is withdrawing, but it would appear, that at least for the discrimination claim, Plaintiff is not relying on Defendant's failure to promote as the

basis. Rather, Plaintiff states that "the ITR processing, awards, and impacts upon his supervisory decisions were adverse employment actions." (*Id.* at 15.)[3]

Plaintiff's discrimination claim, as it now stands, appears to be that he was discriminated against for filing EEO complaints, and that, in response, his supervisors escalated and kept open baseless harassment investigations against Plaintiff. Plaintiff complains that, after filing an EEO Complaint against senior executives and supervisors back in 2018, he "endured five (5) harassment complaints in his last five years of employment," and that each was unsubstantiated and resulted in "Incident Tracking Reports" ("ITRs"), which generally undermined Plaintiff's efforts at promotion. (*Id.* at 2.) Plaintiff largely blames Sterling Keys, one of his supervisors. In Plaintiff's view, Keys knew of Plaintiff's previous EEO activity and was involved with a host of wrongs against Plaintiff. (*See generally* Dkt. 36.) But such vague assertions "do not suffice to meet plaintiff's burden on summary judgment for [his] Title VII discrimination claim." *Harris v. Addus Homecare*, No. 21-CV-1174, 2024 WL 4493334, at *7 (N.D. Ill. Oct. 15, 2024) (citing *Winsley v. Cook Cnty.*, 563 F.3d 598, 605 (7th Cir. 2009)).

To be sure, Plaintiff focuses on one particular ITR that arose out of a harassment complaint against Plaintiff filed by federal air marshal ("FAM") Josh. B. (Dkt 37 ¶ 6.) Although the parties dispute some details, they agree that Plaintiff thought Josh B. had been dishonest, and that Plaintiff conveyed the decision, made by his supervisors, to remove Josh B. from international missions for 90 days (a

---

[3] What "impacts upon his supervisory decisions" means is unclear; Plaintiff's summary judgment response does not clarify the matter.

shorter suspension than Plaintiff recommended). (Dkt. 37 ¶¶ 6–7, Dkt. 41 ¶ 7.) After Plaintiff helped relay that decision, Josh B. filed a harassment complaint against Plaintiff. (Dkt. 37 ¶ 8.) Plaintiff believes that Josh B.'s complaint could have been resolved at the Chicago field office level and was meritless, but instead it was escalated and proceeded to an ITR, and ASACs David Park and Robert Duerr conducted the fact-finding. (*Id.* ¶¶ 7–10.) The ITR remained open against Plaintiff for a year. (*Id.* ¶ 12.) Plaintiff complains that the ITR was unnecessarily left open for too long, and, as a result, awards he had earned for his performance were withheld for over a year; Plaintiff also did not receive "on-the-spot" awards he had earned. (Dkt. 41 ¶ 35.)

Even assuming that Defendant's decision to conduct an investigation into alleged harassment committed by Plaintiff somehow constitutes racial discrimination against Plaintiff, the Title VII discrimination claim cannot move forward. This is because, as addressed below, Plaintiff failed to exhaust his available administrative remedies; fails to show an adverse action; fails to show a proper comparator; and fails to show evidence of racial motivation.

a.   <u>Exhaustion of Administrative Remedies</u>

The first hurdle for Plaintiff's is his failure to timely exhaust available administrative remedies for most of his complaints. A federal employee seeking Title VII relief must attempt to resolve the matter informally through his agency's EEO Office "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). As a general rule, when the claimant "does not initiate contact

within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies." *Pillow v. McDonough*, No. 22-CV-6337, 2024 WL 4213216, at *6 (N.D. Ill. Sept. 16, 2024). As Plaintiff's formal EEO complaint makes clear, Plaintiff learned of the escalation of Josh B.'s complaint in or around September 2019 when fact finding began, and the performance awards for which Plaintiff was denied likewise occurred in 2019. (*See* Dkt. 32 at 146; Dkt. 41 ¶ 14.) But Plaintiff waited until October 27, 2020 to contact an EEO counselor. (Dkt. 32 at 145.) Defendant argues Plaintiff failed to timely exhaust his claims by waiting until 2020 to make EEO contact because Plaintiff needed to do so within 45 days of learning about the Josh B. investigation. (Dkt. 30 at 7–8.)

Plaintiff argues that the EEO contact was timely because the formal complaint was accepted by his agency[4] and because Plaintiff raised the matter within 45 days of receiving the closure letter for the Josh B. investigation. (Dkt. 36 at 5–6.) Plaintiff further argues that anything mentioned in the formal EEO complaint is fair game under the theory that the Seventh Circuit has "adopted a liberal standard for reviewing the scope of an EEOC charge," which is that claims are within the scope and cognizable in federal court if they "like or reasonably related to the allegations of the charge. . . . " (*Id*. at 5 (quoting *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005).)

At issue here is timeliness, not scope. Defendant rightly argues that Plaintiff

---

[4] Even so, courts must perform a *de novo* review of the administrative record. *Smith v. Potter*, 445 F.3d 1000, 1011 (7th Cir. 2006).

knew about the investigation (along with most of the wrongs he complains about) long before he filed the EEO complaint at issue here, and that Plaintiff's decision to wait until the Josh B. investigation was closed out renders much of his discrimination claim untimely. (Dkt. 42 at 2.) Plaintiff's response to this argument is, essentially, that waiting until the closure letter was sufficient because Plaintiff did not know when or if his awards would be paid until after the final closure of the ITR. (Dkt. 36 at 6.) But that is an implicit concession that, aside from the length of the investigation and some award payments, much of Plaintiff's discrimination complaint is untimely.

In other words, if Plaintiff knew about an issue and did not timely make EEO contact, then Plaintiff failed to timely exhaust administrative remedies. On the other hand, if Plaintiff did not know about an issue until the closure letter, then those issues are timely raised. Accordingly, Plaintiff cannot rely on the existence of the Josh B. investigation[5] or its impact on his performance awards as the basis for his discrimination claim because Plaintiff knew about those long before the closure letter. (Dkt. 32 at 156; Dkt. 42 at 2.) Plaintiff, however, timely exhausted his administrative remedies with respect to the length of the ITR and for the "on-the-spot" awards

---

[5] Moreover, even if exhaustion is not an issue, it is unclear how Defendant's decision to proceed to an ITR (*i.e.* to open up a formal investigation) in response to Josh B.'s complaint can itself constitute an adverse employment action. A court is "not a super-personnel department that second-guesses employer policies that are facially legitimate." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014). An adverse employment action must entail "a significant change in employment status," and "not everything that makes an employee unhappy is an actionable adverse action because, otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Reives v. Ill. State Police*, 29 F.4th 887, 894 (7th Cir. 2022) (cleaned up). Plaintiff might have been unhappy with the decision to investigate and escalate Josh B.'s harassment complaint beyond the Chicago field office, but such displeasure is not itself an adverse employment action.

because he was unaware he was entitled to receive those awards until the closure of the investigation.

b.  Adverse Employment Actions

Plaintiff has the burden at the summary judgment stage to show a *prima facie* case of discrimination, and that burden includes pointing out the relevant adverse employment action. Adverse employment actions "include a broad array of actions such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.' " *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The adverse "employment action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Id.* (quoting *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)).

Plaintiff highlights the delayed (but ultimately paid out) performance awards and the lack of "on-the-spot" awards as adverse actions. (*See* Dkt. 41 ¶ 35; Dkt. 32 at 69; Dkt. 36 at 15–16.) Because the performance awards were ultimately received, Plaintiff's *de minimis* loss is not sufficient to constitute an adverse employment action.[6]

As for the never-received "on-the-spot" awards, those are a different matter. Although Plaintiff does not precisely quantify his loss, he says the awards would

---

[6] The Seventh Circuit has "specifically held that a de minimus change in an employee's income does not amount to an adverse employment action." *Allen v. Potter*, No. 04-CV-1262, 2007 WL 2710441, at *4 (C.D. Ill. Sept. 13, 2007) (citing *Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996)).

generally range from $1,500 to $3,000 each and would be awarded twice per year. (Dkt. 32 at 69.) Plaintiff says he did not know that he did not receive the on-the-spot awards until after the closure of the ITR. (Dkt. 36 at 6.) Plaintiff's failure to quantify the lost on-the-spot awards is unhelpful, but, taken in the light most favorable to Plaintiff, the loss is more than *de minimis* and constitutes an adverse employment action.

A final matter is the length of the Josh. B investigation. According to Plaintiff, that the investigation went on for over a year without being closed out constituted an adverse employment action. (Dkt. 36 at 6, 15–16.) Delayed closure of an open ITR could constitute a sufficient adverse employment action if, as Plaintiff argues, the existence of the ITR has meaningful impacts on Plaintiff's employment, such as by delaying or stopping awards.

Plaintiff fails his burden to cite sufficient record evidence for a jury to conclude that the ITR complaint was, in fact, unnecessarily delayed. Plaintiff states that David Park, who conducted the ITR, could not, based on his twenty-one years with FAMS, describe "another situation similar to this where the fact finding was closed, there was no additional contact and or follow up about the fact finding, and yet the ITR remained open against Jordan for almost a year." (Dkt. 41 ¶ 37.) But as Defendant correctly notes, the cited material says the exact opposite.[7] In fact, Park explained

---

[7] "Q: As far as, from your experience have you ever had a situation where the fact finding that was the subject of an ITR was completed, submitted and yet the ITR was allowed to linger and be left open for months after the completion of fact finding? Have you ever experienced that? A: Yes, sir. Q: So you've experienced situations where the ITRs are just, remain open and not closed out after the fact finding was completed? A: Yes, sir." (Dkt. 32 at 106.)

that in another investigation he conducted, the investigation was open for approximately a year after fact finding concluded. (Dkt. 32 at 106.) This lack of evidence means a jury could not reasonably find that the apparent delay in concluding the Josh B. investigation was adverse to Plaintiff.

In sum, Plaintiff demonstrates only one timely exhausted adverse action: that he did not receive "on-the-spot" awards during the Josh B. investigation.

c. <u>Disparate Treatment</u>

Plaintiff fails to meet his burden to show that he was treated less favorably than similarly situated employees, who must be " 'directly comparable' in all material respects." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (quoting *Reed v. Freedom Mortg.*, 869 F.3d 543, 549 (7th Cir. 2017)). This inquiry is "flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?' " *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). The similarly situated requirement was intended to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable," namely, discriminatory or retaliatory animus. *Id.* at 846 (internal quotation marks omitted). Whether a comparator is similarly situated is "typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (internal quotation marks omitted).

16

Plaintiff admits that "it is difficult to identify specific comparators when the adverse action is unprecedented." (Dkt. 36 at 16.) As to his failure to receive awards, Plaintiff cites no specific individual for comparison, which would be another employee who was subject to an ITR but who, unlike Plaintiff, received earned "on-the-spot" awards. Instead, Plaintiff cites to "ASAC Buchanan" as a comparator. *(Id.)* It appears Plaintiff is referring to a Caucasian employee who had the same job as Plaintiff and whom Plaintiff believes was treated better by his supervisors. (*See id.*; Dkt. 41 ¶ 34.) Among many issues with this comparison is Plaintiff's failure to show that Buchanan was subject to an ITR for which he was treated more favorably than Plaintiff.[8] Buchanan is not a proper comparator, for either the awards or any of the other issues Plaintiff complains. This failure alone precludes Plaintiff from showing a *prima facie* case of discrimination.

d.  <u>Holistic Assessment</u>

Because Plaintiff fails to show a *prima facie* case under the *McDonnell Douglas* method, the Court must consider the evidence as a whole and determine whether all the relevant evidence "would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Relevant evidence includes smoking gun evidence such as a defendant's "actual admission of discriminatory intent." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citing *Mullin v. Temco Mach.*,

---

[8] Even if Plaintiff was relying on his non-selection for the SAC or DEAA roles, Buchanan cannot serve as a proper comparator, which would require Plaintiff to show that Buchanan applied for those roles and was treated more favorably that Plaintiff.

*Inc.*, 732 F.3d 772, 776 (7th Cir. 2013)). Circumstantial evidence, such as evidence that the employer's stated reasons for terminating the plaintiff were pretextual, is also relevant. *See Coleman*, 667 F.3d at 852. All the "evidence belongs in a single pile and must be evaluated as a whole" to determine discriminatory intent. *Ortiz*, 834 F.3d at 766.

On the record developed through discovery, and as outlined above, Defendant is entitled to summary judgment on the race discrimination count. Plaintiff produces no smoking gun evidence to show he was the victim of race-based discrimination. Plaintiff largely fails to show that he was subject to actionable adverse actions. That failure, paired with Plaintiff's belief that he was mistreated by his supervisors or treated less favorably than Buchanan, is not sufficient to raise a genuine issue of material fact as to discrimination. Put another way, the assertion that Plaintiff's workplace ills were related to his race lacks evidentiary support. Accordingly, Defendant is entitled to summary judgment on Count I.

### B. Race-Based Hostile Work Environment (Title VII) (Count II)

Defendant is also entitled to summary judgment on Plaintiff's race-based hostile work environment claim (Count II). To survive summary judgment on a Title VII hostile work environment claim, Plaintiff must demonstrate that " '(1) [he was] subject to unwelcome harassment; (2) the harassment was based on [his] race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.' " *Walker v. City of Markham*, 676 F. Supp. 3d 623, 632 (N.D. Ill. 2023) (quoting *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018)).

As to the third element, a court must consider "whether the conduct was severe or pervasive–which depends on 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.' " *Id.* (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).

Plaintiff fails to make out a triable hostile work environment claim. A workplace need not be "hellish" to constitute a hostile work environment, but an actionable claim requires that the workplace be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive enough to alter the conditions of employment. *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019); *Scaife v. VA*, 49 F.4th 1109, 1115 (7th Cir. 2022).

Plaintiff fails to show the requisite pervasiveness or severity. Plaintiff first tries to base his hostile work environment claim on the "singular act of leaving [Plaintiff] with an ITR for an unsubstantiated claim for nearly a year." (Dkt. 36 at 17–18.) But it is reasonable for an employer to investigate alleged harassment at work, and Plaintiff does not put forth evidence to conclude that the investigation was left open because of Plaintiff's race. Simply put, the ITR issue is not pervasive or substantial enough for a hostile work environment claim.

Plaintiff next contends that there was a "continued pattern of harassment investigations, never substantiated but always left open during the time of his desire for promotion" and that this added to the hostile environment. (Dkt. 36 at 18.) But Plaintiff's "general workplace complaints do not allow the Court to infer that a

reasonable person would find his work environment hostile and instead appear to merely reflect [Plaintiff's] displeasure with his supervisors' management. . . ." *Duniya v. Power*, No. 21 C 3399, 2023 WL 2755132, at *4 (N.D. Ill. Apr. 3, 2023) (citing cases). And even if this conduct were to be considered severe or pervasive, Plaintiff still does not show, with sufficient citations to the record, that his supposed mistreatment was on account of his race. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim (Count II).

### C. Retaliation (Title VII) (Counts III, IV)[9]

Defendant is entitled to summary judgment on Plaintiff's retaliation claims. To survive summary judgment, a plaintiff's Title VII retaliation claim must present sufficient evidence to create a question of fact as to whether he: (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) there is a but-for causal connection between the two. *See Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). A plaintiff's alleged protected activity "must be specifically identified." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014).

Plaintiff succeeds in meeting the first and second prongs but fails to show a genuine question of but-for causation. Plaintiff's argument appears to be that

---

[9] As the Seventh Circuit has explained, the "creation of a hostile work environment can be a form of retaliation." *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 567 n.5 (7th Cir. 2004); *Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996). Because Plaintiff fails show a hostile work environment, Plaintiff cannot succeed on a retaliation by hostile work environment claim. Accordingly, Defendant is entitled to summary judgment on Count IV.

Defendant knew of Plaintiff's previous EEO activity and that Plaintiff was not selected for two positions as a result. In particular, Plaintiff complains that Sterling Keys, one of Plaintiff's supervisors, knew about the earlier EEO complaints in which Plaintiff complained about Keys and others. (*See* Dkt. 36 at 3, 8.) Plaintiff filed complaints against supervisors in 2018, 2019, and 2020, and Plaintiff believes that he was not selected for the Atlanta SAC or DEAA positions because Keys, or other supervisors, were aware of Plaintiff's earlier EEO activity.[10] (*See* Dkt. 32 at 34–36.)

Plaintiff also refers to another federal lawsuit he filed against Defendant. (Dkt. 39-10; Dkt. 36 at 10.) EEO complaints and federal discrimination lawsuits are protected activity under Title VII, so the first prong is met. *Ismail v. DeJoy*, No. 23 C 851, 2025 WL 371781, at *6 (N.D. Ill. Feb. 3, 2025); *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009). On the second prong, Plaintiff identifies, and Defendant does not dispute, that his non-selection for the Alanta SAC or DEAA positions are adverse actions. (Dkt. 36 at 7–11; Dkt. 42 at 3.)

Plaintiff's insurmountable hurdle is but-for causation. In deciding whether there is a genuine issue of material fact as to causation, the Court "must 'consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation.' " *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936–37 (7th Cir. 2022) (quoting *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)). One way to show causation is for a plaintiff to put forth direct evidence, such as a statement by the

---

[10] The 2020 EEO complaint serves as the basis for this case, so Plaintiff must be referring to the 2018 and 2019 EEO complaints as the protected activity for which he was retaliated against.

employer. *See Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Causation can also be shown by "presenting a convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission." *Id.* (internal quotations omitted.) Such evidence could include "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn." *Id.* at 860 (cleaned up). Each alleged adverse action is addressed in turn.

### 1.   *Non-Selection for Atlanta SAC Vacancy*

Plaintiff first suggests that he was not selected for the Atlanta SAC vacancy because Sterling Keys knew of Plaintiff's previous EEO activity and was the lead-panelist (of the three-person panel) that did not select Plaintiff for the position. (Dkt. 36 at 8; Dkt. 41 ¶¶ 20–25.) Plaintiff's argument is that because Keys knew of Plaintiff's earlier EEO activity, because Keys ranked Plaintiff amongst the lowest of potential candidates, and because the EEO activity occurred within one year of the non-selection, the non-selection must have been caused by Plaintiff's protected activity.[11] (*See* Dkt. 36 at 7–9.) Plaintiff further points out that Keys called Plaintiff to inform him of the non-selection.[12] (*Id.* at 9.)

---

[11] Plaintiff also references an EEOC opinion in an unrelated case which, according to Plaintiff, established that Keys was found to have retaliated against a former African American employee in another matter. (Dkt. 36 at 7–8; Dkt. 39-11.) The facts in that case are different and do not concern Plaintiff. Accordingly, the Court does not consider this character-propensity evidence against Keys on summary judgment.

[12] The parties dispute what Keys told Plaintiff, but Plaintiff says that Keys told him that he "did not want to be 'the scrooge that ruined Christmas but that they decided to go another way.'" (Dkt. 36 at 9; Dkt. 37 ¶ 18.) It is unlikely that a reasonable jury could conclude that this informal heads-up call supports Plaintiff's retaliation claim.

This is insufficient to show but-for causation. Lacking any direct evidence, Plaintiff appears to mostly rely on suspicious timing and argues that because Keys knew of Plaintiff's 2019 EEO activity and was involved in the Atlanta non-selection in 2020, Plaintiff "satisfies the necessary time and proximity for a prima facie case of retaliation." (Dkt. 36 at 8.) Plaintiff, however, relies on the wrong legal standard when he cites to EEOC decisions which say that, in general, the EEOC has "held that a reasonable time following the protected activity is established if the events occurred within one year of each other." (*Id.* at 6.) In federal court, suspicious timing, by itself, is "rarely enough" to establish causation, and standing alone, a year is too long to establish causation. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (suspicious timing is sufficient on summary judgment only "in an extreme case . . . where the adverse impact comes on the heels of the protected activity.") (cleaned up); *see also Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (to infer causation from suspicious timing on summary judgment, "we typically allow no more than a few days to elapse between the protected activity and adverse action.").

Merely that Keys knew of Plaintiff's protected activity, and the following year was involved in the Atlanta non-selection, is not sufficient to show causation. Nor is Plaintiff's allegation that Keys scored Plaintiff among the lowest of all potential candidates. (Dkt. 41 ¶ 22.) Plaintiff's citation to the record (Dkt. 39-8 at 2) does not support that claim. Rather, the evidence indicates that Keys scored five other applicants lower than Plaintiff and that among all three of the panelists, Plaintiff scored fifth out of sixteen applicants. (*See id.*) Plaintiff does not allege, let alone

produce evidence to show, that the two other panelists knew about his previous EEO activity or that Keys unduly influenced their assessment. There is, in short, insufficient evidence in the record to find that Plaintiff's earlier EEO activity was the cause of the Atlanta non-selection.

### 2. Non-selection for Deputy Director ("DEAA") Vacancy

Plaintiff also fails to show but-for causation for his non-selection to the DEAA vacancy. Plaintiff applied for the DEAA position in 2020 but was not selected for an interview. (Dkt. 37 ¶ 19.) Plaintiff admits that "[h]ere, the element of causation is more tenuous," but nonetheless asserts that causation is satisfied because Michael Ondocin, allegedly one of the panel members,[13] reported to David Kohl, who Plaintiff named in an EEO complaint and in a federal lawsuit. (Dkt. 36 at 10; Dkt. 37 ¶ 19.) Plaintiff has not cited to any record evidence to indicate that Ondocin, or any of the panelists involved in the DEAA selection, were aware of Plaintiff's prior EEO activity. That fact that alone undermines causation. *See Brown v. K.R. Miller Contractors Inc.*, No. 16 C 10823, 2018 WL 2966961, at *3 (N.D. Ill. June 13, 2018) ("To establish the necessary causal link, a plaintiff ordinarily must show that the decisionmaker who imposed the adverse employment action was aware of his protected activities.") Rather, Plaintiff merely asserts, without evidence, that Ondocin "would have knowledge and awareness of Plaintiff's lawsuit and complaints against the former Director Kohl, Keys, Phifer, and others within the FAMS." (Dkt. 36 at 11.) That assertion is insufficient at the summary judgment stage. Accordingly, there is no

---

[13] Defendant disputes this and says Ondocin had no role. (Dkt. 41 ¶ 29.)

genuine issue of material fact as to the DEAA non-selection.

## IV.    CONCLUSION

Defendant's motion for summary judgment is granted.

SO ORDERED in No. 22-cv-02453.

Date: September 29, 2025

JOHN F. KNESS
United States District Judge